IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

March 30, 2026

LAURA A. AUSTIN, CLERK
BY: **/s/ E. Jones**
DEPUTY CLERK

M.M., a Minor, by and through her next       )
friend and mother, Elizabeth Morris,         )
    Plaintiff,                          )
                                        )    Civil Action No. 7:25-cv-00004
v.                                           )
                                        )    By: Elizabeth K. Dillon
TIMOTHY R. DEROSHA,                          )        Chief United States District Judge
    Defendant.                          )

**MEMORANDUM OPINION AND ORDER**

Plaintiff M.M., a minor, brings this action under 42 U.S.C. § 1983 against defendant

Timothy R. Derosha, alleging a violation of her substantive due process rights under the

Fourteenth Amendment. This action arises from events surrounding a traffic stop that took place

in a hospital parking lot while M.M.'s father was driving her to the emergency room during a

medical emergency.[1] Pending before the court is Derosha's motion to dismiss for failure to state

a claim and on grounds of qualified immunity. (Dkt. No. 11.) The motion has been fully briefed

and argued. For the following reasons, the court will deny Derosha's motion to dismiss.

## I. BACKGROUND[2]

On December 6, 2022, ten-year-old M.M. was not feeling well. Although she had an

appointment scheduled with her family doctor that day, her condition worsened, prompting

M.M.'s father, Michael Morris (Morris), to contact the doctor. Morris was advised to take M.M.

---

[1] M.M.'s father, Michael Morris, has filed a separate action against Derosha, alleging claims for excessive and/or unreasonable force and false arrest. *See Morris v. Derosha*, Case No. 7:24-cv-00858 (W.D. Va.).

[2] The factual allegations in this section are drawn from M.M.'s complaint (Compl., Dkt. No. 1), as well as the 911 audio recording attached to Derosha's motion to dismiss (911 Recording, Dkt. No. 12-1). A district court "may consider documents attached as exhibits to the complaint, as well as any documents attached to the motion to dismiss, so long as those documents were integral to the complaint and are authentic." *Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 317 n.2 (4th Cir. 2017) (citing *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164, 166 (4th Cir. 2016)). Because the 911 call is referenced multiple times in M.M.'s complaint (Compl. ¶¶ 16, 17, 19) and there is no dispute as to the recording's authenticity, the court considers the 911 audio recording when evaluating Derosha's motion to dismiss.

directly to the emergency room instead of her scheduled appointment.  (Compl. ¶ 13.)  Heeding

the doctor's advice, Morris drove M.M. to Lewis Gale Medical Center Emergency Room,

accompanied by Elizabeth (Mrs. Morris), who is his wife and M.M.'s mother.  (*Id.* ¶ 14.)

En route to the emergency room, M.M's condition deteriorated, and she was experiencing

significant difficulty breathing.  Morris increased his speed, traveling around 65 miles per hour

in a 45 mile-per-hour zone.  Approximately two miles away from the emergency room, Morris

encountered a red light.  After ensuring the intersection was clear, he activated his hazard lights

and proceeded through the red light.  (Comp ¶ 15.)  It was then that Derosha, a Trooper with the

Commonwealth of Virginia, Department of State Police, began to pursue Morris to initiate a

traffic stop.  (*Id.*)  However, Morris did not stop.  Instead, he called 911 to let them know that

Derosha was pursuing him, but his daughter was experiencing a medical emergency, so he was

en route to the emergency room, which was less than two miles away.  Morris proceeded through

two additional red lights before arriving at the emergency room parking lot, still on the phone

with 911 dispatch.  (*Id.* ¶ 16.)

At that time, Morris shouted from his vehicle to Derosha, pleading to be allowed to take

M.M. inside the hospital.  Derosha then exited his vehicle and drew his service firearm on

Morris, while M.M. and Mrs. Morris remained inside the car, ordering Morris to put his hands

up.  Morris pleaded, "You're going to kill her [M.M.]."  Derosha responded, "I'm going to kill

you if you move again."  Derosha then issued a series of commands to Morris, including

ordering him to place his hands on the steering wheel, step out of the vehicle, face the vehicle

door, and get on his knees, all while keeping his firearm aimed at Morris.[3]  Morris complied with

---

[3]  Just before being ordered to his knees, Morris informed Derosha he had a concealed firearm on his person.  Derosha then told Morris that he would shoot him if he moved.  Morris advised Derosha to just take his firearm and explained that he was on the phone with 911.  (Compl. ¶ 17; *see also* 911 Recording, Dkt. No. 12-1.)

each command while continuing to plead with Derosha to allow his daughter to go inside the hospital because she was dying.  Despite these pleas, Derosha did not provide any medical assistance to M.M.  (Compl. ¶¶ 17, 18; *see also* 911 Recording.)  Furthermore, Mrs. Morris was unable to take M.M. to the emergency room due to Derosha "having a firearm pointed at Morris and threatening to kill him."  (*Id.* ¶ 18.)  Thus, M.M. was detained inside the vehicle.  (*Id.* ¶ 32.)

It was then that 911 dispatch allegedly instructed Derosha that a child in the vehicle was experiencing a medical emergency requiring immediate assistance.  (Compl. ¶ 19.)  Derosha then asked Morris, "What is the matter with your daughter?"  (911 Recording 2:14:39.)  Morris responded, "She has severe pneumonia.  She can't breathe."  (*Id.* at 2:14:41.)  Morris continues to plead with Derosha to allow M.M. to receive medical attention.  Some additional time passed before Derosha informs the Morris family that "they are going to send somebody out."  (*Id.* at 2:15:02.)  However, no medical personnel were sent out to the parking lot.

M.M. alleges that over one and a half minutes elapsed after Derosha pointed his firearm at Morris before Derosha asked dispatch if medical personnel could be sent to the parking lot.  (Compl. ¶ 19.)  It was not until a minute after that—over two and a half minutes from when Derosha pointed his firearm at Morris—that Derosha permitted Mrs. Morris to take M.M. into the emergency room to seek treatment.  (*Id.*)

M.M. received treatment at Lewis Gale Medical Center Emergency Room, but her condition required more advanced care.  (*Id.* at ¶ 22.)  She was transported later that day to Chippenham Hospital in Richmond, Virginia, via ambulance, where she remained hospitalized for several days.  (*Id.*)

M.M. brings one claim under 42 U.S.C. § 1983, alleging that Derosha violated her

substantive due process rights under the Fourteenth Amendment.[4]  She contends that she was detained and unable to leave while Derosha had his firearm pointed at her father and that, despite being informed of her medical emergency, Derosha failed to provide first aid and delayed lifesaving medical treatment.  (Compl. ¶ 32.)  M.M. alleges that Derosha's conduct "shocks the conscience," as he acted with deliberate indifference to her medical needs.  (*Id.* ¶ 33.)  As a result, she claims to have suffered physical and emotional injuries and seeks compensatory and punitive damages.  (*Id.* ¶¶ 36, 37.)

## II.  LEGAL STANDARDS

### A.  Motion to Dismiss

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's allegations must "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'"  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).  The plausibility standard requires more than "a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  "[A] formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

In determining whether the plaintiff has met this plausibility standard, the court must accept as true all well-pleaded facts in the complaint and any documents incorporated into or

---

[4]  The complaint asserts two counts.  Count I alleges claims against Derosha under 42 U.S.C. § 1983 for violation of substantive due process, 42 U.S.C. § 1985 for conspiracy, and Article I, § 11 of the Virginia Constitution, while Count II seeks injunctive relief against the Commonwealth of Virginia, Department of State Police.  Pursuant to stipulations, the claim against the Commonwealth was dismissed (Dkt. No. 19), as were the § 1985 and Article I, § 11 Virginia Constitution claims against Derosha (Dkt. No. 20).  Accordingly, the sole remaining claim before the court is M.M.'s § 1983 substantive due process claim under the Fourteenth Amendment against Derosha.

attached to it. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but it "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)). "Although a motion pursuant to Rule 12(b)(6) invites an inquiry into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the face of the complaint clearly reveals the existence of a meritorious affirmative defense . . . [such as] qualified immunity." *Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (citing *Brockington v. Boykins*, 637 F.3d 503, 506 (4th Cir. 2011)).

**B. Qualified Immunity**

"Qualified immunity shields police officers who commit constitutional violations from liability when, based on 'clearly established law,' they 'could reasonably believe that their actions were lawful.'" *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 667 (4th Cir. 2020) (citing *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 537–38 (4th Cir. 2017)). In determining whether qualified immunity applies, courts conduct a two-step inquiry: "(1) whether a constitutional violation occurred; and (2) whether the right was clearly established at the time of the violation." *Id.* "Because qualified immunity is an immunity from suit, and not merely a defense to liability, courts must scrutinize and dismiss appropriate cases on qualified immunity grounds early in the litigation." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 786 (4th Cir. 1998) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).

## III.  DISCUSSION

In his motion to dismiss, Derosha contends that M.M.'s substantive due process claim under the Fourteenth Amendment fails because his alleged actions do not "shock the conscience." (Br. Supp. Mot. to Dismiss 7–11, Dkt. No. 12.)  Derosha further maintains that qualified immunity  shields him from liability.  (*Id.* at 11–13.)  The court first addresses whether M.M. has sufficiently alleged a substantive due process claim before determining whether Derosha is entitled to qualified immunity.

### A.  M.M. has Sufficiently Alleged a Violation of Her Substantive Due Process Rights Under the Fourteenth Amendment.

Derosha argues there was no constitutional violation of M.M.'s substantive due process rights, maintaining that "a delay of two-and-a-half minutes for a passenger to receive medical care in the context of an officer conducting a felony traffic stop[5] does not shock the conscience." (*Id.* at 7.)  To state a substantive due process claim under the Fourteenth Amendment, a plaintiff must allege that the defendant's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Dean v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (internal citations omitted).  Although the parties agree that the "shocks the conscience" standard applies in this case, they disagree as to the level of culpability necessary for Derosha's conduct to qualify as conscience-shocking.  Therefore, the court must first determine the applicable standard of culpability before considering whether M.M. has plausibly alleged that Derosha's conduct violated her substantive due process rights under that standard.  *See Dean*,

---

[5]  Derosha characterizes the incident as a felony traffic stop for eluding in violation of Virginia Code § 46.2-817.  The complaint acknowledges this, by alleging Derosha sought and obtained a felony arrest warrant charging Morris with eluding under Virginia Code § 46.2-817(B).  (Compl. ¶ 23.)  Derosha attaches to his motion to dismiss a copy of the arrest warrant issued by the Commonwealth of Virginia on December 10, 2022.  (*See* Dkt. No. 12-2.)  However, the complaint further alleges that the Roanoke County Commonwealth's Attorney declined to pursue a grand jury indictment for felony eluding.  "Instead, Morris was indicted for reckless driving . . .  and ultimately convicted of [i]mproper [d]riving . . . which is a mere traffic infraction." (Compl. ¶ 25.)

976 F.3d at 414 ("As a threshold matter then, [courts] must first determine what level of culpability is required for [defendant's] actions to be considered 'conscience shocking.'" (citing *County of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)).

### 1. Standard of culpability—"intent to harm" or "deliberate indifference"

In *Washington v. Housing Authority of the City of Columbia*, 58 F.4th 170 (4th Cir. 2023), the Fourth Circuit discussed the two levels of culpability applicable to substantive due process claims under the Fourteenth Amendment.

> [T]he Supreme Court has "described a 'culpability spectrum' along which behavior may support a substantive due process claim." *Dean*, 976 F.3d at 414 (quoting *Lewis*, 523 U.S. at 848–49)).
>
> On one end of the spectrum is "conduct intended to injure [that is] in some way unjustifiable by any government interest." *Lewis*, 523 U.S. at 849. Such conduct most likely rises to the conscience-shocking level. *Id.* On the other end is "negligently inflicted harm [which] is categorically beneath the threshold of constitutional due process" conduct. *Id.*; s*ee also DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 202 (1989) ("[T]he Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation.").
>
> But conduct falling in between those two poles—deliberate-indifference conduct which is more than negligence but less than intentional harm—presents a closer call. "[D]eliberate indifference is 'an intermediate level of culpability' that can, if proven, also establish a due process violation." *Dean*, 976 F.3d at 415 (citing *Lewis*, 523 U.S. at 848–49). Ultimately, the applicable standard of culpability for a substantive-due-process claim—either "intent to harm" or "deliberate indifference"—depends on "an exact analysis of [the] context and circumstances" of the case. *Id.* at 414; *see also Lewis*, 523 U.S. at 850 ("Rules of due process are not . . . subject to mechanical application in unfamiliar territory.").

*Id.* at 177–78.

In *Lewis*, the Supreme Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressible by an action under § 1983." 523 U.S. at 854. The Court explained that

police officers "are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Id.* at 853 (citing *Whitley v. Albers*, 475 U.S. 312, 320 (1986)).  "Thus, the intent-to-harm standard most clearly applies in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation." *Dean*, 976 F.3d at 414 (citation modified).  Since *Lewis*, courts have extended the application of the intent-to-harm standard beyond high-speed chases to circumstances involving officers responding to emergency calls. *Id.* at 414–15; *e.g.*, *Terrell v. Larson*, 396 F.3d 975, 980  (8th Cir. 2005) (holding that intent-to-harm standard applies, as a matter of law, to officers responding to an emergency).

On the other hand, the deliberate-indifference standard "is sensibly employed only when actual deliberation is practical." *Washington*, 58 F.4th at 178 (citing *Dean*, 976 F.3d at 415). The Fourth Circuit explained that courts are only to employ the deliberate-indifference standard of culpability "where the official has the luxury of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Id.* (citation modified).  "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." *Id.* (internal citations omitted).

Derosha contends that the court should apply the more stringent intent-to-harm standard, arguing that he was confronted with a rapidly unfolding felony traffic stop that afforded no meaningful opportunity for reflection or deliberation.  (*See generally* Br. Supp. Mot. to Dismiss 7–11; Reply in Supp. Mot. to Dismiss 2–6, Dkt. No. 18.)  M.M. maintains that the deliberate-indifference standard applies because Derosha had time to assess the situation.  Furthermore, she argues that, even if the traffic stop was a "hyperpressurized environment," as Derosha maintains,

it was a situation of his own making.  She contends that the court should consider the totality of the circumstances, including Derosha ignoring her father's repeated pleas to allow her to proceed to the emergency room, thereby delaying urgently needed medical treatment.  (*See generally* Br. Opp'n Mot. to Dismiss 6–9, Dkt. No. 15.)

As noted above, determining which standard applies requires "'an exact analysis of [the] context and circumstances' of the case."  *Washington*, 58 F.4th at 178 (citing *Dean*, 976 F.3d at 414).  The court acknowledges that making this determination at the motion-to-dismiss stage, without the benefit of discovery, is a challenging endeavor.  However, it must do so mindful of the Rule 12(b)(6) standard, accepting M.M.'s allegations as true and drawing all reasonable factual inferences in her favor.

Derosha attempts to analogize the allegations in this case to two others applying the intent-to-harm standard of culpability.  But both are materially distinguishable.  First, Derosha cites the Supreme Court's decision in *Lewis*.  There, a sheriff's deputy initiated a high-speed pursuit after a motorcycle carrying two teenagers failed to stop.  The chase lasted approximately 75 seconds through a residential neighborhood at speeds reaching 100 mph, with the motorcycle weaving through traffic and forcing other vehicles off the road.  The motorcycle tipped over during a sharp turn.  Although the driver fell clear, the passenger, Lewis, remained in the roadway and was struck by the patrol car at approximately 40 mph, fatally injuring him.  *Id.* at 836–37.

Lewis's parents brought a substantive due process claim under the Fourteenth Amendment.  The district court granted summary judgment to the deputy on qualified immunity grounds, but the Ninth Circuit reversed, applying a deliberate-indifference standard to high-speed pursuits.  The Supreme Court reversed the Ninth Circuit, holding that in the context of a

rapidly evolving police chase requiring split-second decision-making, only a purpose to cause harm unrelated to legitimate law enforcement objectives satisfies the "shocks the conscience" standard necessary for a substantive due process violation. *Lewis*, 523 U.S. at 853–54.

The allegations in this case are different from the facts in *Lewis* in many important ways. Although the complaint acknowledges that Morris was traveling 20 mph over the speed limit while driving M.M. to the emergency room, his speed did not reach anywhere near 100 mph. Although Morris ran three red lights, he was not weaving in and out of traffic, or forcing other cars off the road, like the motorcycle in *Lewis*. Morris is alleged to have activated his hazard lights, ensured there were no cars in the intersection, and proceeded through a red light. (Compl. ¶ 15.) Subsequently, when Derosha began pursuing him, Morris ran two additional red lights, but "at no time causing any other vehicles to have to deviate from their lane of travel to avoid him," before ultimately pulling into the emergency room parking lot. (*Id.* ¶ 16.)

More importantly, M.M.'s alleged injuries did not occur during the pursuit. Rather, the allegations are that the harm occurred after the pursuit ended, during the approximately two minutes and thirty seconds that M.M. was detained and not allowed to receive critical medical care after Morris's car was parked outside of the emergency room. (*Id.* ¶¶ 19, 32–38.) Simply put, Derosha did not face the same split-second decisions as the sheriff in *Lewis*. Accordingly, *Lewis* does not support the application of the intent-to-harm standard of culpability here.

Second, Derosha relies on the Third Circuit's decision in *Vargas v. City of Philadelphia*, 783 F.3d 962, 965 (3d Cir. 2015). There, a 15-year-old girl was suffering a severe asthma attack at her home. As her condition deteriorated, her mother called 911 for emergency assistance. While waiting for paramedics, the girl collapsed outside the home, gasping for air, and quickly lost consciousness. A family member attempted CPR but was unsuccessful. Others tried to

place her in a car to transport her to the hospital.  Over an approximately six-minute period, five

separate 911 calls were placed.  *Id.* at 966.  Two police officers responded to the scene based on

a report of a "person screaming," but they were not informed it was a medical emergency.  The

events that followed were disputed: the family claimed the officers obstructed the vehicle and

delayed transport, while the officers asserted that the girl was already on the ground when they

arrived and that they assisted in trying to help.  Regardless of which account was accurate, it was

undisputed that one officer advised waiting for the ambulance upon hearing it approaching,

which, according to the dispatch records, arrived just over one minute after the officers arrived at

the scene.  The girl was transported to the hospital, arriving approximately twenty minutes after

the first 911 call was placed.  She was pronounced brain dead upon arrival and died two weeks

later.  *Id.* at 966–68.

The district court granted summary judgment, and the Third Circuit affirmed, finding that

the officers' conduct did not rise to the level of a constitutional violation.  The Third Circuit

noted:

> [The officers] came in response to a 911 call noted simply as "person screaming" and they in fact encountered a group of screaming, frantic adults and an unconscious child.  No one disputes that the police arrived at a tense and chaotic scene, that they endeavored to determine what was happening, and that, when it was plain that there was a medical emergency and an ambulance was about to arrive, they had everyone wait for the paramedics.

*Id.* at 974.

The Third Circuit described the setting as a "hyperpressurized environment," and

remarked, "[i]t is a stretch to say that these facts rise even to the level of negligence, let alone to

deliberate indifference or an intent to harm."  *Vargas*, 783 F.3d at 974.  The court emphasized,

"[w]hile the officers' behavior and language . . . may have been less than polite or

11

compassionate, it was not actionable." *Id.* Accordingly, the officers' actions were not conscience-shocking and did not support a due process claim.

Although *Vargas* and the present case both involve a minor experiencing a medical emergency involving difficulty breathing, the circumstances differ significantly. In *Vargas*, the child was having an asthma attack at her home, and 911 was called to bring medical personnel to her house. In M.M.'s case, her father was transporting her to the hospital to receive medical care and was in the emergency room parking lot when Derosha first confronted M.M. In *Vargas*, officers arrived at the scene unaware of the medical emergency, equipped only with reports of a "person screaming." In M.M.'s case, the officer observed Morris driving over the speed limit, ensuring an intersection was clear, and running a red light en route with his hazard lights on. Derosha continued to pursue Morris for approximately two miles until he pulled into the emergency room parking lot. Then, Morris immediately informed Derosha of the dire medical situation. In addition, shortly thereafter, 911 dispatch notified him of the same.

In *Vargas*, the officers could hear the ambulance approaching and chose to wait for the paramedics rather than transport the minor themselves, with one officer testifying that he waited because paramedics are "better trained" to handle that type of situation. *Vargas*, 783 F.3d at 972. Although the exact time between when the officers arrived on scene and when the ambulance arrived was in dispute, police dispatch records indicated it was just over a minute. M.M., on the other hand, was already at the hospital when Derosha confronted her father. Instead of allowing M.M. to simply enter the emergency room to receive the critical medical attention she needed, it allegedly took him approximately 90 seconds to attempt to bring medical staff out to the parking

12

lot[6] through dispatch, and when that did not happen, another minute to allow Mrs. Morris to take M.M. inside the hospital to receive treatment.

Additionally, the officers in *Vargas* arrived at a hyperpressurized environment, whereas Derosha is alleged to have played a key role in creating the hyperpressurized environment by pulling his service weapon on Morris, issuing a series of commands, and depriving M.M. of receiving medical care for approximately two minutes and thirty seconds. As the Fourth Circuit has made clear, determining which standard of culpability applies requires exact analysis of the circumstances and context of the case. *Washington*, 58 F.4th at 178. The circumstances of *Vargas* vary drastically from the allegations in M.M.'s complaint and accompanying 911 audio. Therefore, the court is unpersuaded that *Vargas* supports the application of the intent-to-harm standard of culpability here.[7]

The court further notes that both *Lewis* and *Vargas* were decided at the summary judgment stage of litigation, with the benefit of a developed factual record following discovery to assess the context and circumstances surrounding the alleged substantive due process violations. By contrast, in resolving the present motion to dismiss, the court does not have a developed record, drawing only from the allegations in the complaint and attached 911 audio recording, and it must construe all reasonable inferences in M.M.'s favor.

Based on the record before the court, one reasonable inference that can be drawn is that

---

[6] It was likely not a surprise that emergency department personnel would not respond to a scene where a law enforcement officer was detaining a man at gunpoint.

[7] The court notes that the Third Circuit found the officers' conduct insufficient to support a substantive due process claim under either the intent-to-harm standard or the deliberate-indifference standard. *Vargas*, 783 F.3d at 974. The Third Circuit went further, observing that the officers' actions likely did not even rise to the level of negligence. *Id.* This distinction is important because *Vargas* did not definitively decide the boundaries of the intent-to-harm standard. Rather, the court emphasized that, under any applicable standard, the officers' conduct was not actionable and did not support a substantive due process claim. Accordingly, Derosha's reliance on *Vargas* to justify applying the intent-to-harm standard is misplaced.

Derosha had time for deliberation—at least two minutes and thirty seconds of deliberation—and in a light most favorable to plaintiff, even more time.  Given the allegations, the court infers that the time frame includes at least some portion of the pursuit of Morris's vehicle.  Although M.M. acknowledges that her father was speeding 20 mph over the speed limit while driving her to the emergency room (Compl. ¶ 15), the other circumstances alleged cannot be ignored.  Morris had his hazard lights activated when he ran the first red light—emergency lights designed to alert other drivers to a potential safety risk and to exercise caution.  (*Id.*)  Morris also ensured that the intersection was clear.  Derosha pursued Morris for approximately two miles before Morris parked his car just outside the Lewis Gale Emergency Room.  (*Id.* ¶ 16.)  A reasonable inference based on these allegations alone suggest Derosha should have known an occupant in the vehicle was experiencing a medical emergency, thus allowing Derosha time to deliberate the next appropriate course of action while driving and after observing the destination.

Even if Derosha was not able to piece together the information at that time, Morris immediately tried to inform Derosha, once he was parked in the emergency room parking lot, that M.M. was experiencing a medical emergency that required immediate attention.  (*Id.* ¶ 17.)  The situation escalated from there, with Derosha pulling his firearm on Morris, issuing a series of commands, including ordering him to step out of his vehicle—all while M.M. and Mrs. Morris remained in the car, audibly distraught.  (Compl. ¶¶ 17–19; *see also* 911 Recording.)  Although it is not clear from the record when dispatch informed Derosha that M.M. was experiencing a medical emergency, it is alleged that it occurred sometime after Morris was ordered to his knees, with Derosha's gun still pointed at him.  (*Id.*)  The complaint acknowledges that Derosha then asked dispatch if medical personnel could be sent to the parking lot, but that was 90 seconds after Morris informed him of M.M.'s medical emergency.  (*Id.* ¶ 19.)  It was another minute before he

14

allowed M.M. to enter the hospital to receive the critical medical care that she desperately needed.  (*Id.*)

Although Derosha's pursuit of Morris's vehicle might constitute a "hyperpressurized environment" where the intent-to-harm standard applies, the alleged substantive due process violation did not occur during the pursuit but rather in the actions that followed.  Construing the allegations in the complaint in a light most favorable to M.M., the "rapidly evolving, fluid, and dangerous situation" concluded by the time Derosha pulled up behind Morris's parked vehicle in the emergency room parking lot and learned of M.M.'s medical emergency.  Although the situation in the parking lot was tense, the allegations contained in the complaint and accompanying 911 audio recording lead to the reasonable inference that Derosha was the primary cause of that tense environment.

All told, the complaint alleges at least two minutes and thirty seconds where deliberation was practical for Derosha.  During that time M.M. was prevented from receiving necessary life-saving care, despite Derosha being repeatedly informed by Morris that his daughter was experiencing a medical emergency—critical time when someone is unable to breathe.  Furthermore, M.M. had already arrived at the parking lot of the very facility equipped to provide life-saving care.  Rather than permitting her immediate entry into the emergency room, Derosha delayed her access for approximately 150 seconds, before finally allowing her to proceed inside.  Accordingly, at this stage of the litigation, accepting all well-pleaded allegations as true and drawing all reasonable factual inferences in M.M.'s favor, the court finds that the deliberate-indifference standard of culpability is the appropriate standard to evaluate whether Derosha's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  *Dean*, 976 F.3d at 416.

**2.   Plaintiff has adequately alleged that Derosha's actions "shock the conscience."**

Having concluded that the deliberate-indifference standard governs the "shocks the

conscience" inquiry at this stage of litigation, the court next considers whether M.M. has

plausibly alleged that Derosha's conduct violated her substantive due process rights under that

standard.

To state a substantive due process claim under the Fourteenth Amendment for deliberate

indifference to a serious medical need, a plaintiff must plead:

> (1) [she] had a medical condition or injury that posed a substantial
> risk of serious harm; (2) the defendant intentionally, knowingly, or
> recklessly acted or failed to act to appropriately address the risk that
> the condition posed; (3) the defendant knew or should have known
> (a) that the [plaintiff] had that condition and (b) that the defendant's
> action or inaction posed an unjustifiably high risk of harm; and (4)
> as a result, the [plaintiff] was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023) (internal citations omitted).

Turning to the allegations contained in the complaint and audio from the 911 recording,

the court finds that M.M. has sufficiently alleged that Derosha was deliberately indifferent to her

serious medical needs.  First, M.M. alleges that she was experiencing a medical emergency

because she was having significant difficulty breathing, which was later confirmed to be a severe

case of pneumonia.  (Compl. ¶¶ 13, 15.)  The severity of her illness ultimately resulted in her

being transported to a Richmond, Virginia hospital via ambulance, where she remained for

several days.  (*Id.* ¶ 22.)

Second, M.M. has sufficiently alleged that Derosha, either knowingly or recklessly, failed

to act to appropriately address the risk that her medical condition posed.  She alleges that

"Derosha was repeatedly informed that M.M. was in the midst of a medical emergency that

deprived her of oxygen."  (Compl. ¶ 32.)  He was told not only by Morris, but also by dispatch of

M.M.'s medical emergency.  (*Id.* ¶¶ 16–19.)  After being told by Morris that M.M. couldn't

16

breathe, instead of allowing M.M. to leave the vehicle and go to the emergency room, mere feet away, he did nothing for approximately 90 seconds to address her medical needs. (*Id.* ¶ 19.) Although it was then that he inquired of dispatch if medical personnel could be sent out to the parking lot, he still did not allow M.M. to leave. (*Id.*) Another minute passed before Derosha permitted Mrs. Morris to take M.M. into the emergency room to seek treatment. (*Id.*) This alleged conduct sufficiently demonstrates that Derosha recklessly failed to take appropriate action to address the serious risk created by M.M.'s inability to breathe.

Third, it is alleged that Derosha knew or should have known that the M.M. was having a medical emergency and that his actions/inactions posed an unjustifiably high risk of harm. As discussed above, Morris was speeding 65 mph in a 45-mph zone and ran a red light, when Derosha initiated the traffic stop. (Compl. ¶ 15.) Rather than pulling over immediately, Morris traveled approximately two miles with his hazard lights activated, proceeded through two additional red lights, and then turned into the Lewis Gale Emergency Room parking lot. (*Id.* ¶¶ 15–16.) As the Fourth Circuit emphasized in *Short*, "it is enough that the plaintiff show that the defendant acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" 87 F.4th at 611 (citing *Farmer*, 511 U.S. at 836)). Construing all reasonable inferences in M.M.'s favor, those allegations alone indicate that Derosha should have known there was a strong likelihood that an occupant in the vehicle needed immediate medical attention. But even if Derosha was unable to come to that conclusion then, his first interaction with Morris, right after he left his police vehicle, was Morris informing him that his daughter needed to go to the emergency room because she couldn't breathe. (Compl. ¶ 16; *see also* 911 Recording.) Instead of allowing M.M. to proceed inside the hospital to

receive care, Derosha's reaction was to pull his service gun on Morris and threaten to kill him if he moved again.  (Compl. ¶ 17; *see also* 911 Recording.)

It is obvious that when someone cannot breathe, they require immediate medical care.  In that type of medical emergency, seconds matter.  Despite the circumstances surrounding the traffic stop and Derosha's direct knowledge of M.M.'s inability to breathe, he chose to do nothing to address M.M.'s dire situation for 90 seconds.  (Compl. ¶¶ 15–19.)  Morris was already parked outside of the emergency room and complying with Derosha's commands.  Dispatch then also informed Derosha of the medical emergency.  (*Id.* ¶ 19.)  Ninety seconds after he exited his vehicle and drew his firearm on Morris, Derosha finally decided to act, but he did so in a way that still posed an unjustifiably high risk of harm to M.M.  Instead of allowing her to just enter the hospital, Derosha allegedly asked dispatch to send personnel out to the parking lot—wasting valuable additional seconds.  (*Id.*)  It is a reasonable inference that Derosha realized his continued detention of M.M. posed a high risk of harm because approximately one minute later, when no medical personnel came to the parking lot, he permitted Mrs. Morris to take M.M. inside the emergency room to receive medical treatment.  (*Id.*)  Based on these allegations and the reasonable factual inferences drawn from them, M.M. has sufficiently alleged that Derosha knew or should have known she was experiencing a medical emergency that impaired her ability to breathe, and that his actions and inactions posed an unjustifiably high risk of harm.[8]

Lastly, M.M. alleges that, as a result of Derosha's deliberate indifference to her medical needs that day, she "suffered serious emotional injuries, physical injury, pain and suffering, [and] mental anguish."  (Compl. ¶ 36.)

---

[8] The court notes that these allegations satisfy the subjective test that governed deliberate indifference claims under the Fourteenth Amendment prior to the Fourth Circuit's adoption of the objective test in *Short*.  (S*ee* discussion *infra* Section III.B.1.)

18

Therefore, accepting all well-pleaded allegations as true and drawing all reasonable factual inferences in M.M.'s favor, the court finds that Derosha's conduct, as alleged in the complaint, shocks the conscience. Accordingly, she has sufficiently alleged a violation of her substantive due process rights under the Fourteenth Amendment.

**B. Derosha Is Not Entitled to Qualified Immunity at This Time.**

Derosha argues that he is entitled to qualified immunity under both prongs of the analysis. First, he asserts that he did not violate a constitutional right, relying on the same reasoning he used to argue that M.M. failed to state a substantive due process claim—namely, that his conduct did not "shock the conscience." Second, Derosha contends that, at the time of the incident, it was not clearly established that a passenger had a constitutional right to be free from a delay—approximately two minutes and thirty seconds—in receiving medical care while an officer conducted a felony traffic stop and assessed the situation. (*See* Br. Supp. Mot. to Dismiss 11–13; Reply in Supp. Mot. to Dismiss 6–11.) The court addresses the first prong of the qualified immunity inquiry, whether a constitutional violation occurred, before turning to the second prong, whether the right was clearly established at the time of the incident.

The court notes that Derosha has not considered the allegations and inferences in a light most favorable to plaintiff when he argues qualified immunity at the motion to dismiss stage. First, the passenger (a child) was detained, was not suspected of any criminal activity, and was obviously in need of medical care. Second, the delay, in a light most favorable to plaintiff, was at the very least two minutes and thirty seconds and an inference can be made that it was longer. Finally, rather than a generic felony traffic stop, the court looks to the traffic stop under the circumstances alleged in the complaint.

19

## 1.  Whether a constitutional violation occurred

When evaluating whether M.M. sufficiently alleged a substantive due process claim under the Fourteenth Amendment, the court applied the test set forth in *Short*, 87 F.4th at 611, as it is binding precedent on the court when evaluating a deliberate indifference claim under the Fourteenth Amendment.  (*See* discussion *supra* Section III.A.2.)  However, *Short* was decided on December 8, 2023, whereas the events at issue are alleged to have taken place on December 6, 2022.  The qualified immunity test "requires looking to the law *at the time* of the conduct in question."  *Mays v. Sprinkle*, 992 F.3d 295, 301 (4th Cir. 2021) (emphasis in original); *see, e.g., Connell v. Russell*, No. 1:22CV935, 2024 WL 2722135, at *3–7 (M.D.N.C. May 28, 2024) (applying *Short* to the merits of a plaintiff's substantive due process claim under the Fourteenth Amendment, but not to the qualified immunity analysis because qualified immunity looks backward to what the law was at the time of the conduct).  Accordingly, the court must look at the law as it existed at the time of the incident in determining whether Derosha is entitled to qualified immunity.

A Fourteenth Amendment claim for deliberate indifference to serious medical needs prior to *Short* included objective and subjective elements.  *Sprinkle*, 992 F.3d at 300.  Applying the test in the context of a pretrial detainee's claim against a prison official, the *Sprinkle* court explained:

> The objective element requires a "serious" medical condition. [*Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014).] A medical condition is objectively serious when it either is "diagnosed by a physician as mandating treatment" or is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)). And for the subjective element, the prison official must have acted with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The subjective state of mind required is that of "deliberate indifference . . . 'to inmate health or safety.'" *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 834). And deliberate

indifference requires that the official have "had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178; *Parrish ex. rel. Lee v. Cleveland*, 372 F.3d 294, 302 (4th Cir. 2004) ("[D]eliberate indifference requires a showing that the defendants . . . actually knew of and ignored a detainee's serious need for medical care." (quoting *Young v. City of Mount Ranier*, 238 F.3d 567, 575–76 (4th Cir. 2001))).

*Id.*

Applying this subjective test to the allegations in M.M's complaint, the court still finds that plaintiff has sufficiently alleged a Fourteenth Amendment deliberate indifference claim against Derosha. The objective test adopted in *Short*, which the court already applied above, "differs from [the] prior subjective test in one respect only." Under *Short*, the plaintiff does not have "to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." 87 F.4th at 611. But under the older test, which the court now applies for purposes of its qualified-immunity analysis, M.M.'s allegations must satisfy the pre-*Short* subjective test, which required that Derosha had actual knowledge of M.M's serious medical condition and consciously disregarded the risk posed by his inaction. The court finds that M.M.'s allegations also satisfy this slightly higher standard, for many of the same reasons the court previously discussed. (*See* discussion *supra* Section III.A.2.)

For example, M.M. alleges that Morris immediately informed Derosha, once he was parked in the emergency room parking lot, that M.M. was having a medical emergency and could not breathe. Morris continued to plead with Derosha to allow M.M. to enter the hospital to obtain medical treatment. Additionally, M.M. alleges that dispatch instructed Derosha that there was a child in the vehicle experiencing a severe medical crisis that required immediate

21

assistance. This satisfies the first part of the subjective test—Derosha had actual knowledge of M.M.'s serious medical condition.

Regarding Derosha's conscious disregard of the risk that his inaction would result in harm, this is likewise sufficiently pleaded. "A defendant's subjective knowledge of the risk may be inferred from circumstantial evidence." *Dean*, 976 F.3d at 416 (citing *Parrish*, 372 F.3d at 303). The court need not revisit every circumstantial allegation discussed above (*see* discussion *supra* Section III.A), but it will highlight several of the key allegations. Derosha first observed Morris, with his hazard lights activated, run a red light after ensuring the intersection was clear. Morris then continued speeding with his hazard lights on, and Derosha followed him for approximately two miles, when Morris pulled into the emergency room parking lot. Derosha was immediately told by Morris that M.M., a child not suspected of any crime and detained, could not breathe. It is common knowledge that an inability to breathe presents a dire medical emergency. Derosha did nothing to address this emergency for 90 seconds after learning about M.M.'s inability to breathe. Although it was then that he asked dispatch if medical personnel could be sent out to the parking lot, he still did not allow M.M. to leave, and personnel never responded to the parking lot. It is a reasonable inference that Derosha realized his continued detention of M.M. posed a high risk of harm because approximately one minute later he permitted Mrs. Morris to take M.M. inside the Lewis Gale Emergency Room to receive medical treatment. This satisfies the second part of the subjective test—Derosha had actual knowledge of the excessive risk posed by his inaction.

When evaluating a motion to dismiss, the court must accept the well-pleaded allegations as true and draw all reasonable factual inferences in M.M.'s favor. Doing so, the allegations plausibly state that Derosha had actual knowledge of M.M.'s serious medical condition and

consciously disregarded the substantial risk of harm posed by delaying her access to emergency medical care.  Accordingly, M.M. has adequately alleged a constitutional violation under the pre-*Short* deliberate-indifference standard.

### 2.  Whether the constitutional right was clearly established at the time of the violation

Having determined that the complaint sufficiently alleges that Derosha violated M.M.'s substantive due process rights by detaining her and preventing her from receiving necessary care during a medical emergency—that is, by acting with deliberate indifference to her serious medical needs—the court now turns to the second prong of the qualified immunity analysis: whether that constitutional right was clearly established at the time of the alleged violation.

"A right is clearly established if, at the time of the alleged offense, the contours of the right allegedly violated were sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Dewet v. Rollyson*, 157 F.4th 344, 349 (4th Cir. 2025) (citing *Lewis v. Caraballo*, 98 F.4th 521, 534 (4th Cir. 2024)).  "This determination is an objective one, dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances." *Dean*, 976 F.3d at 417 (citation modified).  "Clearly established does not mean that the very action in question has previously been held unlawful, but it does require that, in the light of pre-existing law the unlawfulness of the official's conduct must be apparent." *Id.* (citation modified).

In making this determination, courts should "examine cases of controlling authority in this jurisdiction—that is, decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose, to determine whether a reasonable official would be on notice that his actions violate the law." *Dewet*, 157 F.4th at 349 (citation modified).  "If there are no such decisions from courts of controlling authority, courts may look to a consensus of cases of

23

persuasive authority from other jurisdictions if such exists." *Dean*, 976 F.3d at 417 (citation

modified).

The cases do not need to be identical. *Dewet*, 157 F.4th at 349. "Officials can still be on

notice that their conduct violates established law even in novel factual circumstances." *Id.*

(citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). However, "the law must be 'sufficiently clear

that every reasonable official would have understood that what he is doing violates that right.'"

*Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

With this legal framework in mind, the question to be resolved is whether a reasonable

officer in Derosha's position would have understood that detaining a passenger/child who was

not suspected of any crime and was experiencing a medical emergency during a traffic stop and

preventing her from obtaining necessary medical care violated the child's substantive due

process rights. Derosha argues that, at the time of the incident, there was no clearly established

right protecting a passenger from a brief delay in receiving medical care while an officer

conducted a felony traffic stop of the vehicle in which she was riding. (Br. Supp. Mot. to

Dismiss 12–13; Reply in Supp. Mot. to Dismiss 7–11.) The court disagrees.

The court acknowledges that it has not found any controlling precedent from the Supreme

Court of the United States, the Fourth Circuit Court of Appeals, or the Supreme Court of Virginia

that involved identical facts—i.e., where a passenger's access to medical care during a traffic

stop was analyzed as a violation of the passenger's substantive due process rights under the

Fourteenth Amendment. There is, however, at least one district court case addressing a similar

scenario.

In *Baldi v. Philadelphia*, 609 F. Supp. 162 (E.D. Pa. 1985), the court considered whether

a twenty-minute traffic stop could support liability under 42 U.S.C. § 1983 for a violation of

substantive due process.  Police officers stopped a vehicle for running a red light while passenger William Baldi was allegedly in urgent need of medical care and en route to the hospital.  The officers detained the vehicle's occupants and did not provide emergency escort or transportation.  Baldi was later hospitalized and died the following day.  While acknowledging there is no general constitutional right to medical care, the court found that the plaintiff sufficiently stated a claim by alleging either (1) a de facto custodial relationship giving rise to a duty to provide medical care, or (2) deliberate interference with Baldi's ability to obtain emergency treatment.  Accordingly, the § 1983 substantive due process claim survived dismissal.[9]  *Id.* at 167.

While the court acknowledges a single case decided in 1985 from another jurisdiction does not constitute "a consensus of cases of persuasive authority" sufficient to clearly establish a constitutional right for purposes of the second prong of the qualified immunity analysis, it nonetheless provides helpful guidance.  As the Fourth Circuit has noted, "the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."  *Dean,* 976 F.3d at 417.  Importantly, the court "must consider not only specifically adjudicated rights, but also those manifestly included within more general applications of the core constitutional principles invoked."  *Id.* (citation modified).  Since the *Baldi* decision in 1985, the qualified immunity jurisprudence in the context of deliberate indifference to serious medical needs has become more fully developed.  And although there may not be cases directly on point in the context of a passenger experiencing a medical emergency detained in a traffic stop, the jurisprudence regarding pretrial detainees' due process rights under the Fourteenth Amendment

---

[9]  The *Baldi* court relied on Eighth Amendment precedent safeguarding prisoners' right to necessary medical care and Fourteenth Amendment precedent prohibiting the deliberate denial of medical care to individuals in police custody, reasoning that similar protections could extend to a passenger like *Baldi*.  *See Baldi*, 609 F. Supp. at 165–66.

provides "general applications of core constitutional principles" that logically extend to a passenger in a vehicle detained during a traffic stop.

In *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983), the Supreme Court held that the due process clause of the Fourteenth Amendment "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." There, officers responding to a report of breaking and entering attempted to detain a suspect who fled. After repeated commands to stop and a warning shot failed to halt him, an officer shot and wounded the suspect. The officers summoned a private ambulance to take him to the emergency room for treatment. *Id.* at 240–41. The Court did not define the precise "due process obligation to pretrial detainees or to other persons in its care who require medical attention," but it held that whatever the standard, the officers satisfied that obligation "by seeing that [the suspect] was taken promptly to a hospital that provided the treatment necessary for his injury." *Id.* at 245.

At the time of the incident before the court, it was well established that "a pretrial detainee had a right to be free from any form of punishment under the Due Process Clause of the Fourteenth Amendment." *Sprinkle*, 992 F.3d at 301 (citation modified). Additionally, it was clearly established that "a pretrial detainee has a right to be free from deliberate indifference to his serious medical needs and failing to ensure the detainee is transported to someplace where he can receive adequate medical care for those needs violates this constitutional right." *Tarashuk v. Givens,* 53 F.4th 154, 166 (4th Cir. 2022).

Although this case involves an unusual factual scenario, the constitutional principle at issue is not novel. The Fourth Circuit emphasized in *Dean* that courts "need not—and should not—assume that government officials are incapable of drawing logical inferences, reasoning by

26

analogy, or exercising common sense.  In some cases, government officials can be expected to

know that if X is illegal, then Y is also illegal, despite factual differences between the two." *Id.*

(citing *Williams v. Strickland*, 917 F.3d 763, 770 (4th Cir. 2019)).  Thus, it is only logical that

detained passengers experiencing a medical emergency in a vehicle that is pulled over for a

traffic violation are extended at least the same rights afforded to pretrial detainees.  Because

pretrial detainees have a right to be transported to a place where they can receive adequate

medical care, so should a detained passenger experiencing a medical emergency during a traffic

stop.  To conclude otherwise would strain reason and logic.  Accordingly, a reasonable officer in

Derosha's position would understand that these established protections for pretrial detainees

apply to a passenger in the context of a traffic stop.  By preventing a detained passenger from

obtaining adequate medical care, an officer may violate the passenger's substantive due process

rights.

Furthermore, the court finds the Fourth Circuit's emphasis on Judge Gorsuch's language

in a Tenth Circuit opinion particularly applicable here, when discussing the lack of similar cases

directly addressing an alleged constitutional violation.

> [S]ome things are so obviously unlawful that they don't require
> detailed explanation and sometimes the most obviously unlawful
> things happen so rarely that a case on point is itself an unusual thing.
> Indeed, it would be remarkable if the most obviously
> unconstitutional conduct should be the most immune from liability
> only because it is so flagrantly unlawful that few dare its attempt.

*Dean,* 976 F.3d at 417–18 (quoting *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th

Cir. 2015)).

The alleged facts here present this sort of unusual circumstance in which it is

unsurprising that no case is directly on point.  An officer initiates a traffic stop for speeding and

pursues the vehicle for only a few miles.  The vehicle, with its hazard lights activated, pulls into

27

an emergency room parking lot.  The officer then learns that the driver is a father rushing his daughter to the hospital because she cannot breathe.  Rather than allowing the child to receive critically needed medical treatment, the officer draws his firearm, points it at the father, and detains the daughter for approximately two and a half minutes—precious time when she is struggling to breathe.  Under these circumstances, it would be remarkable to conclude that the officer is entitled to immunity for such conduct.

For all of these reasons, the court finds that, at the time of the incident, it was clearly established that an officer who detains a passenger experiencing a medical emergency during a traffic stop and prevents her from obtaining necessary medical care may be held liable for violating the passenger's due process rights under the Fourteenth Amendment by acting with deliberate indifference to her serious medical needs.  A reasonable officer in Derosha's position would have understood that such conduct was unlawful.  Accordingly, the court finds the constitutional right at issue was clearly established at the time of the incident and that Derosha is not entitled to qualified immunity.[10]

## IV.  CONCLUSION

For the foregoing reasons, accepting all well-pleaded allegations as true and drawing all reasonable factual inferences in M.M.'s favor, the court finds that M.M. has sufficiently alleged a substantive due process claim under the Fourteenth Amendment against Derosha.  His alleged conduct shocks the conscience and plausibly states a violation of a clearly established constitutional right at the time of the incident.  Therefore, Derosha is not entitled to qualified immunity at this stage of the litigation.

---

[10] Though discovery may later reveal facts contradicting M.M.'s alleged version of events or provide additional details suggesting that Derosha did not violate a clearly established right, at this early stage of litigation, the facts alleged, when viewed in the light most favorable to M.M., are sufficient to overcome Derosha's qualified immunity defense.

28

Accordingly, it is hereby ORDERED that defendant Timothy R. Derosha's motion to dismiss (Dkt. No. 11) is DENIED.

The Clerk is directed to send a copy of this memorandum opinion and order to all counsel of record.

Entered: March 30, 2026.

/s/ Elizabeth K. Dillon

Elizabeth K. Dillon
Chief United States District Judge